**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES, | **Criminal Action No. 18-662 (SRC)** |
| Plaintiff, | |
| v. | **OPINION** |
| KEITH RODRIGUEZ, | |
| Defendant. | |

**CHESLER**, District Judge

This matter comes before the Court on the motion filed by Defendant Keith Rodriguez ("Defendant"), to suppress evidence seized in connection with his August 14, 2018 arrest and the search of his home. The United States of America (the "Government") opposes this motion. The Court heard argument from counsel and held an evidentiary hearing on the suppression motion, including witness testimony, on April 23, 2019. For the reasons that follow, Defendant's motion to suppress is granted.

**I.   FACTUAL BACKGROUND**

This action concerns a one-count Indictment stemming from Defendant's August 14, 2018 arrest. The Indictment charges that Defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year in a court in the State of New Jersey, knowingly possessed a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). See ECF No. 11. The instant motion principally concerns the suppression of evidence seized during a warrantless search of Defendant's home, in connection with the arrest of a known fugitive and pursuant to a

valid arrest warrant. Defendant contends that the search exceeded the lawful bounds of a limited protective sweep and violated his rights under the Fourth Amendment.

On August 13, 2018, the New York/New Jersey Regional Fugitive Task Force (the "Task Force") of the United States Marshals Service received a confidential tip regarding the location of an individual identified as Shannon Lewis Walker ("Walker"). Walker was a fugitive from justice on a warrant from Roanoke, West Virginia, charging first-degree Murder in violation of Virginia Criminal Code 18.2-32. According to the confidential tip, Walker was alleged to have been staying at 456 Hancock Street in Rahway, New Jersey (the "Subject Premises"), which the Task Force identified as a townhouse that was being rented by Defendant Rodriguez. The August 13, 2018 tip further provided that Walker's child's mother had taken the child to see Walker on the previous day, August 12, 2018.

At approximately 8:30 a.m. the following day, August 14, 2018, members of the Task Force arrived at the Subject Premises. Upon their arrival, law enforcement officers knocked on the front door, which was answered by Defendant. At this time, officers were able to see Walker standing at the top of a staircase leading to the second floor. Defendant granted law enforcement permission to enter and was immediately detained and handcuffed for his own safety. While Defendant was escorted to a bench in front of the residence until he could be properly identified, Officers instructed Walker to come down the stairs to the front of the residence, and he complied. Walker was handcuffed and placed under arrest. According to testimony provided by Immigration and Customs Enforcement/Task Force Officer Shaun Tympanick ("Officer Tympanick") at the suppression hearing, Walker was then secured in the house "somewhere to the left near the kitchen." (Apr. 23, 2019 Hr'g Tr. at 33:15-17.)

Following the arrest of Walker, officers conducted a room-to-room protective sweep of the townhouse. This protective sweep lead officers to notice a handgun holster in plain view on a desk on the first floor of the residence. During the course of this protective sweep, several officers, including Officer Tympanick, proceeded to the second floor of the townhouse. He entered the second-floor back bedroom of the Subject Premises, and observed a mattress lying flush on top of a box spring, which was lying flush to the carpet. (Apr. 23, 2019 Hr'g Tr. at 26:04-10; 27:12-19; 28:01-02.) He checked the closet, and then lifted the mattress— where he located a .40 caliber Black Taurus handgun (the "handgun") bearing serial number SZ104490, between the mattress and box spring. (Apr. 23, 2019 Hr'g Tr. at 26:02-27:05); ECF No. 22 at 13 (Search Warrant Affidavit).

Subsequent to Officer Tympanick's discovery of the handgun, Agent Rossi applied for a federal search warrant for the Subject Premises. The August 14, 2018 affidavit that Agent Rossi submitted in support of that application provided the following information as probable cause for the search:

> 3. After placing WALKER under arrest, law enforcement conducted a protective sweep on the SUBJECT PREMISES. During the sweep, a black .40 caliber Taurus handgun bearing serial number SZ104490 was located beneath a mattress in a second floor bedroom. The weapon was not reported stolen and is operable. After the weapon was located, RODRIGUEZ advised the officers that the weapon belonged to him. According to law enforcement databases, RODRIGUEZ has five prior felony convictions in New Jersey. Most recently, on or about September 25, 2015, RODRIGUEZ was convicted in the Superior Court of New Jersey, Hudson County, of possessing CDS on school property, in violation of N.J.S.A. 2C:35-7, a crime punishable by imprisonment for a term exceeding one year.
>
> 4. Also during the protective sweep, law enforcement located a safe on a small table in front of a crawl space. In an effort to access to the crawl space to ensure no other individuals were inside the residence, law enforcement moved the safe and heard an audible sound of metal scraping the inside of the safe. Based on my training and experience, I know that individuals often store handguns and other weapons inside safes or other concealed containers for safekeeping. I also know

    that individuals sometimes keep personal documents, objects, and other indicia of ownership in secure locations like a safe.

    5. **During the protective sweep, law enforcement additionally located a firearm holster in plain view on a first floor desk and several items consistent with narcotics distribution including small plastic baggies used to package narcotics and a scale used to weigh narcotics and prepare them for distribution. Both the baggies and scale were observed in plain view on a third floor desk and a second-floor bedroom dresser, respectively.** These items were not seized by law enforcement during the arrest of WALKER. The requested Warrant will allow law enforcement to seize the said items and additionally test the baggies and scale for the presence of CDS. The requested warrant will further allow law enforcement to search for and locate indicia of ownership as it pertains to the above items and the firearm recovered from the second-floor bedroom, which will serve to corroborate the statements made by RODRIGUEZ prior to his arrest.

    6. Further, based on information received from the Roanoke City Police Department, it is believed that the homicide committed in Roanoke City for which WALKER has been charged was committed using a silver .9mm Luger Winchester handgun. According to the Roanoke City Police Department, that weapon was never located. Further, the description of the murder weapon does not match that of the weapon located in the second floor bedroom of the SUBJECT PREMISES.

ECF No. 22 at 13-15 (Search Warrant Affidavit) (emphasis added). The Search Warrant was granted at 4:15 p.m. later that day; no other contraband at the Subject Premises was found.

    The Government provided testimony from three law enforcement Task Force Officers during April 23, 2019 evidentiary hearing: Michael Savnick, a Detective with the New Jersey State Police, who was assigned the Task Force and was lead investigator for the Walker case; Officer Shaun Tympanick, a Deportation Officer with Immigration and Customs Enforcement, who was assigned as an officer to the Task Force and was a member of the "stack" entry team that entered the residence; and Agent Anthony Rossi, a Deputy United States Marshal, who was the assigned case agent for the Walker case.

## II. DISCUSSION

The Government argues that the handgun was located during a lawful protective sweep of the premises. The Government then argues, however, that even if the search which revealed the handgun was impermissible, suppression is not required because of the doctrine inevitable discovery. Defendant contends that the protective sweep was conducted in violation of the Fourth Amendment, and disputes that the doctrine of inevitable discovery applies. The Court will address these arguments in turn.

### a. THE PROTECTIVE SWEEP

Although several exceptions exist, "[a] search of a house without a warrant issued on probable cause is generally unreasonable." United States v. White, 748 F.3d 507, 511 (3d Cir. 2014). In Maryland v. Buie, 494 U.S. 325, 334 (1990) the Supreme Court outlined that the Fourth Amendment permits an exception to the warrant requirement, known as a "protective sweep." The Court held that:

> as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Id. The Buie Court emphasized that this protective sweep must be "aimed at protecting the arresting officers, if justified by the circumstances." Id. at 334. The Court also cautioned that the sweep must be "quick and limited," id. at 331, as a protective sweep

> is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

Id. at 335-36. Accordingly, "Buie 'prong 1' permits a warrantless search of a home 'incident to an arrest' occurring in the home, provided that the search is limited to those places 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" United States v. White, 748 F.3d 507, 511 (3d Cir. 2014). However, if a protective sweep extends beyond the area immediately adjoining the place of arrest, "Buie's 'prong 2' authorizes a warrantless search of a home based on reasonable and articulable suspicion that the areas being searched may 'harbor[] an individual' who poses a danger to those present at the scene of the arrest." Id.

As described above, subsequent to Walker's arrest, the officers conducted a room-to-room protective sweep of the entire Subject Premises. The Government argues that it was objectively reasonable to believe that the Subject Premises could have harbored another individual posing a danger to them, based on the fact that: (1) the officers were at the Subject Premises to apprehend a violent fugitive; (2) the Subject Premises was a "multi-room, two story house which clearly had room for more than two occupants;" (3) Officers had received a tip that Walker had been visited by his daughter and her mother at the Subject Premises two days prior to the execution of the arrest warrant; and (4) the officers saw an empty firearm holster in plain view on the first floor while effectuating Walker's arrest.[1] See ECF No. 16 at 4. Moreover, from Officer Tympanick's testimony during the suppression hearing, the Government added that upon

---

[1] The Court notes that neither the search warrant affidavit, nor the testimony provided at the suppression hearing, explained where the desk —on which the empty handgun holster was discovered — was located within the townhouse, other than stating that it was located on the first floor in the Subject Premises. Thus, it is unclear where this desk was located in relation to where Walker was arrested and secured. However, an exhibit attached to the moving papers of Peter R. Willis, Esq., Defendant's prior counsel, states that the empty handgun holster was observed "in plain view on the dresser by the front door." ECF No. 15-3 (Report of Investigation). The "Report of Investigation" is dated August 16, 2018, two days following Walker's and Defendant's arrests. It is unclear from the report which of the Task Force Officers located the firearm holster.

entering the Subject Premises, officers observed approximately five pairs of sneakers near the base of the stairs at the entryway of the home. (Apr. 23, 2019 Hr'g Tr. at 24:10-25:05.)

It is undisputed that <u>Buie's</u> first prong is not at issue here. Instead, because the officers extended their protective sweep beyond the area immediately adjoining where Walker was arrested, the Court must analyze whether the Government has demonstrated that the officers were authorized to conduct a protective sweep under the second <u>Buie</u> prong, based on "specific and articulable facts" which support a reasonably prudent officer's belief that there is an individual posing a danger to those on the arrest scene. 494 U.S. at 334.

Based on the facts in the record, and the principles articulated under <u>Buie</u>, this Court finds that the officers proceeded to search the entire residence, beyond the area immediately adjacent to the place of arrest, without the articulable, reasonable suspicion required by law. Despite the submission of supplemental briefing and the elucidation of testimony from several law enforcement witnesses present during the execution of the arrest warrant, the Government has failed to meet its burden of demonstrating the officers possessed an articulable, reasonable suspicion to justify a protective sweep as broad as the one at issue here.

The Government correctly cites the legal principle required by <u>Buie's</u> second prong; that the searching officer must possess "a reasonable belief, based on specific and articulable facts, that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 337. However, the Government continually and mistakenly asserts that this the reasonable suspicion standard was met, while simultaneously arguing that it was "objectively reasonable for the officers to believe, even after Walker and [Defendant] Rodriguez were handcuffed, that other individuals **could have been in the home**," and that "[Defendant] Rodriguez's home **could have** harbored an individual posing danger to them." ECF No. 16 at 4

7

(emphasis added). As stated above, Buie provides that the standard is that "the searching officer possesses **a reasonable belief based on specific and articulable facts** that the area to be swept **harbors an individual posing a danger to those on the arrest scene**." 494 U.S. at 337 (emphasis added). That officers believed there *could have* been another individual in the home, who may have posed a danger, does not meet this standard. See, e.g., United States v. Nelson, 868 F.3d 885, 889 (10th Cir. 2017) (holding that officers' lack of knowledge about the potential presence of another person cannot constitute the specific, articulable facts required by Buie, and stating that "[i]n short, '[n]o information' cannot be an articulable basis for a sweep that requires information to justify it in the first place.'") (quoting United States v. Colbert, 76 F.3d 773, 778 (6th Cir. 1996)).[2] That Walker was believed to be a violent fugitive does not support the reasonableness of this protective sweep, where he was arrested and secured on the first floor landing without incident, then moved to the kitchen, where he remained secured while other officers proceeded to conduct a "protective sweep" of the second floor. Nor is this sweep supported by the officers' knowledge that two days prior to execution of the search warrant, Walker had been *visited* by his daughter and her mother. Nothing in this confidential tip supports "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Detective Savnik admitted as much on cross-examination:

> A: I testified that I made everybody aware that a mother and a child could possibly be in the residence.
>
> Q: Okay. But you weren't certain if they would be in the residence. Correct?

---

[2] The Tenth Circuit has further explained that:

> For this holding [in Nelson], we reasoned that if officers lack any information about whether someone remains inside a house, they do not have the specific, articulable facts required for a protective sweep beyond the adjacent areas.

United States v. Bagley, 877 F.3d 1151, 1156 (10th Cir. 2017) (citing Nelson, 868 F.3d at 889).

8

> A: There was no way to be certain.
>
> . . . .
>
> Q: . . . The tip, it could lead a person – could lead you to believe that the person took the child to visit with Mr. Walker and after they visited with Mr. Walker, they departed from the residence. Correct?
>
> A: They departed on that day, yes. I'm not sure if they returned.

(Apr. 23, 2019 Hr'g Tr. at 13:24-14:03, 14:18-24.) Moreover, although both Officer Tympanick and Agent Rossi testified that they had personal knowledge or experience of fugitives or other individuals hiding in unusual locations during the execution of arrest warrants, nothing in their testimony actually pointed to the requisite "specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene," during the execution of *this* arrest warrant, as required by Buie.

The Court notes that the Third Circuit recently addressed a similar case of a sister Court involving the permissibility of a protective sweep on the second floor of a residence, in United States v. Howard, 729 F. App'x 181, 187 (3d Cir. 2018) (not precedential). In Howard, the Third Circuit affirmed the district court's denial of the defendant's suppression motion, where the defendant argued that members of Pennsylvania's Fugitive Task Force engaged in a protective sweep of a duplex's second-floor unit which violated his Fourth Amendment rights and was "impermissibly conducted based on standard procedure." Id. The Third Circuit noted that the district court had based its denial on "five discrete findings to determine that the reasonable suspicion standard was met:"

> (1) "Task Force members reported hearing a great deal of noise coming from upstairs, and at least one testified that he thought there were likely multiple people up there from the amount of noise heard"; (2) "although the Task Force knew from the noise that people were inside, no one answered the door over the course of thirty to fifty seconds after they knocked and announced themselves"; (3) "the Task Force had been briefed that there was a 'lot of activity' at the Residence in

9

the days leading up to the arrest, and [a detective] had recently seen at least two other individuals (in addition to Mr. Howard and Ms. Arrington) entering and exiting the Residence"; (4) "the Task Force members knew that the arrest warrant they had for the Defendant was for homicide and that the weapon used in that felony was an assault rifle which had yet to be recovered"; and (5) "although not dispositive, neither Mr. Howard nor Ms. Arrington confirmed for the Task Force that no one else was present upstairs in the immediate aftermath of their arrests."

United States v. Howard, 729 F. App'x 181, 187 (3d Cir. 2018) [alteration in original]. Accordingly, the Third Circuit held that the district court's factual findings justified its conclusion that "a 'reasonable suspicion' of danger existed, especially in light of the fact that this requirement 'is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence,'" id. (citations omitted), and that the Task Force had not acted pursuant to a standard operating procedure. However, the permissibility of the protective sweep upheld in Howard distinguishable. The key distinction here is that, as set forth in Howard, "Task Force members reported hearing a great deal of noise coming from upstairs, and at least one testified that he thought there were likely multiple people up there from the amount of noise heard." No such noises or comparable circumstances were articulated here; in fact, on cross-examination, Officer Tympanick testified that he did not hear movement of any kind before entering the room or before moving the box spring or mattress. (Apr. 23, 2019 Hr'g Tr. at 37:04-13.)

Despite providing testimony from three law enforcement officers present during the execution of the arrest warrant, the Government has failed to provide sufficient specific and articulable facts to support a finding that a "reasonable suspicion" of danger existed for the officers to extend their protective sweep to the second floor of the Subject Premises. While the reasonable suspicion standard is indeed less demanding than the probable cause requirement, it nevertheless requires a fact-specific inquiry and case-by-case determination of whether the

10

officers involved possessed the requisite "specific and articulable facts" sufficient to justify a "cursory inspection of those spaces where a person may be found" under Buie. 494 U.S. at 335. Here, the officers had no reason to suspect, or had any knowledge one way or the other, that a dangerous third person was lurking within the home, or that dangerous unknown persons were hiding on the second floor of the townhouse. Defendant was secured outside, and Walker, the target of the arrest warrant, was secured in the kitchen after being arrested at the base of the stairs near the front entrance of the Subject Premises. That the officers observed five pairs of sneakers near the base of the stairs fails to change this analysis or support the inference that another dangerous individual was hiding within the Subject Premises.

On its own, the observance of an empty handgun holster is insufficient to support a finding of reasonable suspicion that the home harbored an individual on the second floor posing a danger to those on the arrest scene, let alone that such an individual was potentially hiding under a mattress in a hollowed-out box spring in the upstairs rear bedroom. Instead, in light of these facts, this search appears to have been one more akin to a routine or standard operating procedure than one based on specific, articulable facts. To conclude otherwise would be to stretch the "protective sweep" exception to the Fourth Amendment to allow for a "protective sweep" of an entire residence nearly every time an arrest warrant is executed, in direct contravention to the standard articulated in Buie. Because the "protective sweep" of the second floor was not supported by "specific and articulable facts" that would lead an officer to believe that "the area to be swept harbors an individual posing a danger to those on the arrest scene," suppression of the handgun is warranted.

11

b. **THE INEVITABLE DISCOVERY DOCTRINE**

The Supreme Court adopted the inevitable discovery exception to the exclusionary rule in the case of Nix v. Williams, 467 U.S. 431, 444 (1984). The Court reasoned that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." Id. (internal quotation and citation omitted). The Government contends that, because law enforcement officers spotted an empty gun holster and narcotics paraphernalia in plain view while conducting their protective sweep, the handgun would have been legally discovered during that lawful search. The inevitable discovery exception "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. De Reyes, 149 F.3d 192, 195 (3d Cir. 1998) (quoting United States v. Kennedy, 61 F.3d 494, 498 (6th Cir. 1995)). It is the Government's burden to "establish that it had probable cause and prove the existence of 'a chain of events that would have led to a warrant . . . independent of the [unlawful] search.'" United States v. Brown, 328 F.3d 352, 357 (7th Cir. 2003) (quoting United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995)). In determining whether the Government has met its burden, the Court must focus on "historical facts capable of ready verification, and not speculation." De Reyes, 149 F.2d at 195 (citing Nix, 467 U.S. at 444 n.5).

Here, the Government argues that "[w]hile based in part on the recovery of the firearm, the observation of the other items in the residence, including the holster, safe, scale, and items consistent with narcotics distribution, independently warranted the issued search warrant. Thus, even if law enforcement did not lift the mattress during the protective sweep, law enforcement would have recovered the firearm during the subsequent court-authorized search." ECF No. 22 at

2-3. The Government's argument is unavailing. It is clear that in this instance, the decision to seek the warrant was motivated by information uncovered during the protective sweep, i.e., the handgun, the items consistent with narcotics distribution, and the scale.[3] Evidence is considered to be in "plain view" when law enforcement inadvertently comes across or observes apparently incriminating evidence while lawfully searching an area, i.e., pursuant to a warrant or one of the exceptions to the warrant requirement, for specified objects unrelated to the that incriminating evidence discovered without a warrant. Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). And, although Third Circuit case law provides that the plain-view exception extends to protective sweeps, see United States v. Gatson, 744 F. App'x 97, 99-100 (3d Cir. 2018), this only applies where officers were lawfully entitled to be present for the plain view exception to apply. The problem here is that this Court has determined that the officers were not lawfully present when they observed these items. Because the officers did not possess the requisite articulable and specific facts to justify a protective sweep of the second and third floors where they observed the alleged narcotics paraphernalia in "plain view," the plain-view exception necessarily does not apply to these items. Thus, the Court holds that, having determined that the search of the upstairs bedrooms was not legal, these items were not in plain view.

Accordingly, applying these holdings to the inevitable discovery analysis, the Court finds that the Government has failed to demonstrate, by a preponderance of the evidence, that the handgun would have been inevitably discovered by lawful means. As discussed above, the government can meet its burden by showing "that the police, following routine procedures, would inevitably have uncovered the evidence." De Reyes, 149 F.3d at 195 (citation omitted).

---

[3] The Court notes that although the search warrant affidavit states that a safe was found sitting "on a small table in front of a crawl space," there is nothing in the record indicating where exactly in the residence this crawl space and safe were located. See ECF No. 22 at 14 (Search Warrant Affidavit).

13

Analyzing the case from the point just before the illegal search, the Court finds that the facts do not support a conclusion that a warrant for the search of Subject Premises, for evidence regarding the possession of a firearm by a convicted felon and narcotics trafficking, would have issued based on probable cause supplied by the discovery of a safe and an empty firearm holster. The officers made clear they were only at the Subject Premises to apprehend Walker; they were not there to secure or search for evidence of a crime. (Apr. 23, 2019 Hr'g Tr. at 17:05-12.) However, the affidavit in support of the application for a search warrant derived from, and referred to, information obtained during the protective sweep of the residence— namely, the handgun, the narcotics paraphernalia, and the scale. Because the officers were not lawfully present in the areas where the narcotics distribution paraphernalia and handgun were discovered, the only items which could have been used to establish probable cause to support a search warrant were the fact that two months prior to execution of the arrest warrant, Walker had allegedly used a silver .9mm Luger Winchester handgun which had never been recovered, that officers had discovered a safe which made an audible sound of metal scraping when moved, and an empty firearm holster. See ECF No 22 at 13-15 (Search Warrant Affidavit).

      The Court finds, in sum, that applying the inevitable discovery doctrine in this case would not be in the interests of justice. The doctrine "permits the court to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." De Reyes, 149 F.3d at 195 (citation omitted). The balance here weighs in favor of excluding the evidence. Because the handgun was discovered during an unlawful search, the Fourth Amendment requires that the evidence be suppressed.

## III. CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion to suppress. An appropriate form of Order will be filed together with this Opinion.

                                               s/Stanley R. Chesler
                                            STANLEY R. CHESLER
                                            United States District Judge

Dated: April 29, 2019